**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

KEVIN MEHLHOFF,                          )
                                         )
            Plaintiff,                   )
                                         )
vs.                                      )          Case No. 14-cv-267-CVE-TLW
                                         )
CAROLYN W. COLVIN,                       )
Acting Commissioner of Social Security,  )
                                         )
            Defendant.                   )

## REPORT AND RECOMMENDATION

This matter is before the undersigned United States Magistrate Judge for a report and recommendation. Plaintiff Kevin Mehlhoff seeks judicial review of the Commissioner of the Social Security Administration's decision finding that he is not disabled. As set forth below, the undersigned recommends that the Commissioner's decision denying benefits be **REVERSED AND REMANDED IN PART and AFFIRMED IN PART**.

## INTRODUCTION

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423 (d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of that impairment during the time of his alleged disability. 20 C.F.R. §§ 404.1512(b), 416.912(b). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically

acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources," such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). A plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395

F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## BACKGROUND

Plaintiff, then a 51-year old male, applied for Title II and Title XVI benefits on September 23, 2011, alleging a disability onset date of April 1, 2011, for purposes of his Title II application. (R. 155-65). Plaintiff claimed that he was unable to work due to back injury and pain, thyroid issues, diabetes, high blood pressure, and hypertension. (R. 182). Plaintiff's claims for benefits were denied initially on December 1, 2011, and on reconsideration on February 2, 2012. (R. 75-81, 84-92, 97-102). Plaintiff then requested a hearing before an administrative law judge ("ALJ"), and the ALJ held the hearing on August 14, 2012. (R. 43-74). The ALJ issued a decision on August 29, 2012, denying benefits and finding plaintiff not disabled. (R. 22-42). The Appeals Council denied review, and plaintiff appealed. (R. 1-4, dkt. 2).

**The ALJ's Decision**

The ALJ found that plaintiff is insured through December 31, 2015, and has not performed any substantial gainful activity since April 1, 2011, his alleged disability onset date. (R. 27). The ALJ found that plaintiff has severe impairments of "diabetes mellitus, hypertension, degenerative disc disease, obesity, learning disorder and depression." Id. Plaintiff does not meet or medically equal a listing. (R. 27-28). In assessing the severity of plaintiff's mental impairment, the ALJ also considered the "paragraph B" criteria, finding that plaintiff has mild limitations in activities of daily living and in social functioning and moderate limitations in concentration, persistence, or pace. (R. 28).

The ALJ then reviewed plaintiff's testimony and the medical evidence. Plaintiff testified that he last worked as a dishwasher and prep cook in 2010. (R. 30). He stopped working because he had to go to the hospital for what turned out to be a panic attack. Id. Plaintiff testified that it was the only panic attack he has ever experienced. Id. He receives weekly treatment for depression and takes medication prescribed by his doctor. Id. The medication is helpful, although it causes plaintiff to lose his temper. Id. Plaintiff cannot read newspapers or grocery lists and has his girlfriend read the Social Security paperwork to him. Id. Plaintiff can make change. Id.

Plaintiff was injured on the job and sought treatment for back pain from Dr. John Marouk as part of his worker's compensation claim. Id. Dr. Marouk told plaintiff that he was not a candidate for surgery. Id. Plaintiff cannot lift more than twenty-five pounds and cannot stoop, bend, or squat, even to tie his shoes. Id. Plaintiff experiences back pain after sitting for ten minutes but can sit for thirty to forty-five minutes. Id. He can sit for one to two hours in an eight-hour workday. Id. Plaintiff had carpal tunnel surgery in the 1990s but still has trouble grasping, fingering, and picking up small objects due to numbness in his hands. Id. Plaintiff takes pain medication, antidepressants, and insulin. Id. His legs swell from insulin, so he keeps his legs propped up when he is at home. Id.

Plaintiff spends most of his time lying down and watching television. Id. He does use the computer for an hour daily. Id. He also does thirty minutes of light housework daily. Id. He can drive. Id.

Plaintiff testified that he quit school in ninth grade because he could not understand the lessons. (R. 31). He states that he has been fired because he cannot read, but he also stated that he can "read and write some." Id. He passed the driver's license examination, but he stated that he reads road signs by symbol, not words. Id.

The ALJ also reviewed two function reports, both dated October 2011. Id. The first, from plaintiff, indicates that he has no difficulties with activities of daily living, including most household chores. Id. Plaintiff also spends time fishing, watching television, going to movies, and visiting friends. Id. Plaintiff did report difficulty with "lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, memory, completing tasks, concentration, understanding, following instructions, using hands and getting along with others." Id.

Ms. Betty Hairl completed the second function report. Id. She stated that plaintiff is able to care for himself, including preparing meals, shopping, and performing household chores. Id. She also stated that plaintiff rides a bicycle and is able to travel short distances. Id. She reported that plaintiff has difficulty with "lifting, squatting, bending, standing, reaching, walking sitting and kneeling." Id. She estimated that plaintiff can lift twenty-five pounds and walk three blocks. Id. The ALJ gave little weight to Ms. Hairl's opinion because she is not a physician. Id.

With respect to the medical evidence, the ALJ noted that plaintiff's treating physician, Dr. Kenneth Trinidad, cleared plaintiff to return to light duty work (lifting no more than twenty-five pounds) in January 2008. Id. In September 2008, a second treating physician, Dr. Marouk, opined that plaintiff "could lift twenty-five pounds and lift, bend or twist only 15 times in an hour."[1] Id. The following month, Dr. Trinidad opined that plaintiff could return to light duty work. Id.

In April 2011, plaintiff sought emergency treatment for diagnoses of "resolved acute chest pain, resolving acute kidney injury, hypertension and obstructive sleep apnea." Id. Plaintiff's examination was normal. Id. The following month, plaintiff returned to the emergency

_____

[1] Plaintiff argues that Dr. Marouk's opinion states that plaintiff could lift, bend, *and* twist only fifteen times in an hour and that this limitation was more restrictive than the ALJ's interpretation of the opinion suggests. (Dkt. 14).

room complaining of "constant pain" that was "exacerbated by moderate activity." Id. In late May 2011, plaintiff underwent a stress test, which was normal. (R. 32).

Plaintiff sought treatment at Morton Clinic in August and September 2011 for a number of issues, including hypertension, atypical chest pain, hypothyroidism, weight checks, and diabetes-related issues. Id. Plaintiff complained of back pain in mid-September 2011. Id. Examination revealed that plaintiff's lumbar area and bilateral SI joints were tender "to pressure and range of motion." Id. Plaintiff was assessed with back pain. Id. When he returned for follow-up in October 2011, plaintiff reported that his medication "had improved this condition, but not given complete relief." Id. Plaintiff was still tender "to pressure and range of motion," but his "[s]trength and sensation were intact." Id. He received medication refills for back pain in December 2011. Id. Plaintiff was still taking medication for chronic back pain in June 2012. (R. 33). At that time, plaintiff reported that the medication was effective, and he was advised that his dosages would be evaluated the following month "for possible downgrading of medications." Id.

Plaintiff underwent a consultative examination in November 2011. Id. During the examination, plaintiff "exhibited pain with range of motion of the cervical and lumbar spine," but his range of motion was only mildly decreased. Id. Plaintiff's sensation and strength, including grip strength, was normal. Id. Additionally, plaintiff's straight leg test was negative, ambulation was normal and steady, and heel/toe walking was normal. Id. Plaintiff had no difficulty grasping tools and manipulating small objects. Id. Plaintiff did report "degenerative disc disease of the cervical and lumbar spine with Radicular symptoms." Id. Dr. Nodine noted that he did not have x-rays available for review and that plaintiff appeared "relatively high functioning" based on the examination. Id.

Plaintiff also received an assessment for mental health treatment in August 2011. Id. Plaintiff reported feeling depressed "because he could not read or write and could not keep a job." Id. Plaintiff also reported that he had recently suffered a heart attack, which the ALJ pointed out was incorrect. Id. The ALJ also noted that plaintiff did not cite back pain as one of his physical issues. Id. The assessor assigned plaintiff a GAF score of 36 and diagnosed him with major depressive disorder. Id. Plaintiff participated in treatment services for one month before his diagnosis was changed to adjustment disorder. Id. Plaintiff did not qualify for continued services based on the new diagnosis. Id. Plaintiff's treating physician subsequently prescribed Zoloft in October 2011 based on plaintiff's complaints of depression. Id.

Plaintiff underwent a consultative mental examination in November 2011. Id. Plaintiff reported that he could read and write at a sixth grade level and was working toward his GED. Id. His judgment was intact, but he had limited insight. Id. The examining psychologist noted that plaintiff had "[s]ome recent memory impairments" but found "no barriers" in plaintiff's "ability to attend concentrate, consolidate memories or persist." Id. The examining psychologist assessed plaintiff with "major depressive disorder, recurrent, in partial remission and learning disorder, not otherwise specified." (R. 34).

The ALJ then weighed the opinion evidence. The ALJ gave "substantial weight" to the opinions of the agency physicians without summarizing those opinions. Id. The ALJ found that the opinions were "consistent with the rather mild objective medical signs and findings throughout the record." Id. However, the ALJ then found that plaintiff was more limited than those opinions indicated and was capable of performing only light and sedentary work. Id. The ALJ relied on the 2008 opinions of Drs. Trinidad and Marouk, both treating physicians, who found that plaintiff was capable of performing light work (restricted to lifting no more than

twenty to twenty-five pounds and able to "lift, bend or twist only 15 times in an hour). Id. The ALJ stated that the opinions of the treating physicians were consistent with his ultimate conclusions regarding plaintiff's residual functional capacity. Id. The ALJ further noted that, following the opinions of Drs. Trinidad and Marouk, plaintiff did not seek treatment for back pain until September 2011. Id. Even then, the findings were limited to "tenderness of the lumbar area and bilateral SI joints areas with pressure and range of motion" at two examinations. Id. Thereafter, all examinations were normal, and plaintiff's pain appeared to be managed with medication. Id. The ALJ also relied upon the opinion of the consultative examining physician, who found plaintiff to be "relatively high functioning on examination." Id.

With respect to plaintiff's mental impairments, the ALJ noted that plaintiff was taking medication for depression. Id. However, plaintiff's condition was not severe enough to warrant treatment through Family and Children's Services, according to the agency's own records. Id. Although plaintiff reported that he received weekly treatment from Family and Children's Services, the ALJ noted that the administrative record did not contain any medical records regarding ongoing treatment. Id. Finally, the ALJ relied on the consultative examining psychologist's report, which found that plaintiff "exhibited no barriers to ability to attend, concentrate, consolidate memories or persist." Id.

The ALJ then assessed plaintiff's credibility. The ALJ found that plaintiff was not entirely credible because his complaints were inconsistent with the objective medical evidence and because plaintiff's reports of limited activities of daily living were contradicted by his statements in the October 2011 function report. (R. 35).

The ALJ concluded that plaintiff retained the residual functional capacity to perform light work with a restriction to simple and some complex tasks and interaction with peers and co-

workers for work-related tasks. (R. 29). Plaintiff could not perform his past relevant work as a baker/helper, kitchen helper, and building maintenance laborer because those jobs exceeded his residual functional capacity. (R. 35). Relying on the testimony of the vocational expert, however, the ALJ concluded that plaintiff could perform other work, such as a bakery racker, bottling line attendant, and silver wrapper. (R. 36). Accordingly, the ALJ found plaintiff not disabled.

**Plaintiff's Medical Records and the ALJ Hearing**

The undersigned will discuss the medical evidence and testimony from the ALJ hearing as needed in the analysis section.

## ANALYSIS

On appeal, plaintiff raises three issues: (1) that the ALJ erred at steps four and five by failing to include all of plaintiff's limitations in the residual functional capacity findings and/or the hypothetical to the vocational expert; (2) that the ALJ did not conduct a proper treating physician's analysis or explain how he weighed the other medical opinion evidence; and (3) that the ALJ failed to conduct a proper credibility analysis. (Dkt. 14).

**Step Four/Step Five**

Plaintiff argues that the ALJ failed to incorporate the permanent physical restrictions imposed by plaintiff's treating neurosurgeon into the residual functional capacity findings and hypothetical. Id. Plaintiff contends that the lifting, bending, and twisting restrictions prevent him from performing light work. Id. Plaintiff also argues that the ALJ failed to include proper limitations on plaintiff's inability to read and write. Id. Plaintiff contends that his illiteracy renders him disabled under the Medical-Vocational Guidelines ("the Grids"). Id. Alternatively, plaintiff contends that the other jobs listed at step five of the ALJ's decision either exceed

plaintiff's ability to read and write or are not supported by substantial evidence because the limits of plaintiff's ability to read and write are unclear. Id.

The Commissioner argues that the ALJ's hypothetical to the vocational expert includes all of the limitations in the ALJ's residual functional capacity findings; therefore, the only issue is whether the ALJ included all of the limitations supported by substantial evidence in the record. (Dkt. 17). The Commissioner contends that the evidence proves plaintiff is not illiterate. Id. Rather, plaintiff has a "limited education," which does not support a finding of disabled under the Grids. Id. The Commissioner also contends that the other work cited in the ALJ's opinion requires the lowest skill level for math and reading/writing. Id. Accordingly, because plaintiff is not illiterate, he is capable of performing those jobs. Id.

Plaintiff's arguments regarding the lifting, bending, and twisting restrictions are best suited to the discussion of the ALJ's analysis of the treating physician's opinion and will be discussed in that context.

With respect to plaintiff's ability to read and write, the ALJ discussed plaintiff's testimony at the hearing and his reports to mental health practitioners. (R. 30, 31, 33). At the ALJ hearing, plaintiff testified that he could not read the newspaper or a grocery list and that his girlfriend read the Social Security paperwork to him. (R. 30). Plaintiff also testified that he quit school in the ninth grade because he did not understand the lessons and that he had been fired from a job because he was unable to read. (R. 31). Plaintiff was able to pass the driver's examination, but he stated that he reads road signs based on their symbols. Id.

However, plaintiff also testified that he is able to read and write "some." Id. This testimony is consistent with plaintiff's report to the consultative examining psychologist that plaintiff "could read and write at the sixth grade level" and was pursuing his GED. (R. 33). The

consultative examining psychologist assessed plaintiff with a "learning disorder, not otherwise specified" and accepted, without further testing, plaintiff's statement that he could read and write at a sixth grade level. (R. 34).

Literacy is a vocational factor for the ALJ to consider at step five, not a functional limitation to be considered in formulating a claimant's residual functional capacity at step four. See 20 C.F.R. §§ 404.1560(c)(1), 416.960(c)(1) (stating that in the event a claimant's residual functional capacity prevents him from performing his past relevant work, "we will use the same residual functional capacity assessment when we decide if you can adjust to any other work. We will look at your ability to adjust to other work by considering your residual functional capacity and the vocational factors of age, education, and work experience."). The regulations provide two methods for determining a claimant's education level: the numerical grade completed and "actual educational abilities," which encompass "reasoning, arithmetic, and language skills" (reading and writing). 20 C.F.R. §§ 404.1564(b), 416.964(b). The regulations acknowledge that "the numerical grade level that [a claimant] completed in school may not represent [the claimant's] actual educational abilities," particularly when the claimant completed his formal education many years before the impairment began. 20 C.F.R. §§ 404.1564(b), 416.964(b). The ALJ is entitled to rely on the numerical grade completed only when "there is no other evidence to contradict" a claimant's "actual educational abilities." 20 C.F.R. §§ 404.1564(b), 416.964(b).

The regulations also classify different levels of education, both by numerical grade and actual educational ability. 20 C.F.R. §§ 404.1564(b)(1)-(4), 416.964(b)(1)-(4). Those categories are labeled "Illiteracy," "Marginal education," "Limited Education," and "High school education and above." 20 C.F.R. §§ 404.1564(b), 416.964(b). In this case, plaintiff claims he is illiterate, but the ALJ determined that plaintiff has a "limited education." (Dkt. 14; R. 35). Illiteracy is the

lowest level of education and is defined as "the inability to read and write . . . . a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally an illiterate person has had little or no formal schooling." 20 C.F.R. §§ 404.1564(b)(1), 416.964(b)(1). Limited education is defined as possession of the requisite educational abilities, "but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education." 20 C.F.R. §§ 404.1564(b)(3), 416.964(b)(3).

Although the ALJ discusses plaintiff's testimony regarding his literacy in the residual functional capacity analysis, the ALJ reaches no conclusion regarding plaintiff's educational level until step five. (R. 30, 31, 33, 35). The ALJ then concludes, without discussion, that plaintiff "has a limited education and is able to communicate in English." (R. 35). This finding is consistent with plaintiff's testimony that he completed the ninth grade, albeit by taking special education classes for every subject. (R. 48). With that educational background, the ALJ determines that plaintiff can perform other work existing in significant numbers in the national economy and is, therefore, not disabled. (R. 36-37).

Plaintiff argues that the ALJ should not have categorized him as having a limited education. Because there was evidence in the record, in the form of plaintiff's testimony, to contradict the fact that plaintiff has a ninth grade education, the ALJ was required to base his finding on plaintiff's actual educational abilities. See Dixon v. Heckler, 811 F.2d 506, 508-10 (10th Cir. 1987) (holding that testimony from the claimant and claimant's sister, along with a single "passing comment" that the claimant could read but not write prevented the ALJ from relying on plaintiff's grade completion as substantial evidence of her literacy).

The evidence of plaintiff's literacy is not clear. Plaintiff testified at the hearing that he could not read a newspaper or a grocery list. (R. 52). Plaintiff also testified that he could not read and understand the Social Security forms and needed his girlfriend to read them to him. Id. Plaintiff also indicated that he had been fired from previous jobs due to his inability to read but that he could read "some" road signs and had passed the driver's examination. (R. 52, 63-64). In addition, he later told the ALJ that he could read and write "some." (R. 66). Plaintiff also reported to the consultative examining physician that he could read and write at the fifth or sixth grade level and was pursuing his GED. (R. 387). Finally, although the ALJ did not rely on this information, the Social Security employee who took plaintiff's application for benefits noted that although plaintiff claimed that he could not read, he "glanced over application summaries and editied [sic] incorrect names, etc." (R. 179).

In light of this conflicting and contradictory evidence, the undersigned recommends that the case be remanded for the ALJ to determine whether plaintiff is, in fact, illiterate. The issue is not one of harmless error because if plaintiff is illiterate, he qualifies as disabled under Medical-Vocational Rule 202.09 due to his age (closely approaching advanced age) and his previous work experience (unskilled work). See 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 202.09. However, if plaintiff is "at least literate and able to communicate in English," then he is not disabled on the basis of his education under Medical-Vocational Rule 202.10. See 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 202.10. Because the evidence in the record is not clear, the ALJ may find it necessary to order a consultative examination that addresses plaintiff's ability to read and write.

**Opinion Evidence**

Plaintiff argues that the ALJ failed to properly weigh the opinion of treating physician Dr. Marouk, by finding that Dr. Marouk's opinion was "consistent with those determined in this decision." (Dkt. 14, citing R. 34). Plaintiff contends that despite finding that Dr. Marouk's opinion was consistent with the record, the ALJ did not accept the restrictions in Dr. Marouk's opinion. (Dkt. 14). Plaintiff also argues that the ALJ gave substantial weight to the opinions of the agency physicians because their opinions "are consistent with the rather mild objective medical signs and findings throughout the record" but then failed to discuss any of the medical evidence that contradicted those opinions. (Dkt. 14, citing R. 34). Accordingly, plaintiff contends that the ALJ's decision is not clear. (Dkt. 14). Plaintiff also argues that the ALJ misinterpreted two function reports as third-party function reports because plaintiff's friend completed the reports on his behalf.

The Commissioner argues that Dr. Marouk's limitations on lifting, bending, and twisting were imposed prior to the time plaintiff achieved maximum medical improvement with respect to his worker's compensation case and are not inconsistent with the requirements of light work. (Dkt. 17). The Commissioner also notes that Dr. Marouk's opinion was rendered in 2008, several years before plaintiff's April 1, 2011, alleged disability onset date, and that plaintiff continued to work in jobs that exceeded those limitations for almost two years. Id. Additionally, the Commissioner argues that Dr. Trinidad, another treating physician on plaintiff's worker's compensation case, subsequently imposed a restriction to light work with no other limitations, an opinion that is consistent with the opinion evidence relevant to the period of time in which plaintiff alleges disability. Id. With respect to the function reports, the Commissioner contends

that the ALJ correctly identified one report as plaintiff's and one as a third-party function report. Id. The Commissioner also contends that the ALJ properly considered those function reports. Id.

In his reply, plaintiff argues that the Commissioner's arguments are post-hoc rationalizations. (Dkt. 18).

**Dr. Marouk and Restrictions on Lifting, Bending, and Twisting**

In September 2008, Dr. Marouk imposed permanent restrictions on plaintiff, limiting him to lifting a maximum of twenty-five pounds and "minimal lifting, bending, and twisting" of "only 15 times an hour." (R. 284). The ALJ notes the opinion, including the permanent restrictions, and states later in his decision that "the restrictions indicated by the claimant's treating physician are consistent with those determined in this decision" – namely, the ALJ's conclusion that plaintiff could perform the physical demands of light work. (R. 34). Although the ALJ considered and discussed Dr. Marouk's opinion, the ALJ did not conduct a full treating physician's analysis.[2]

The Commissioner correctly points out that Dr. Marouk's September 2008 opinion predates plaintiff's April 1, 2011, disability onset date, implying that the ALJ was not required to conduct a treating physician's analysis. Medical reports that pre-date a claimant's onset date must be considered as part of the administrative record. See Hamlin v. Barnhart, 365 F.3d 1208, 1223 n. 15 (10th Cir. 2004). See also Lackey v. Barnhart, 127 F.App'x 455, 458 (10th Cir. 2005) (unpublished)[3] (rejecting "the proposition that medical reports prior to the operative onset date are categorically irrelevant"). The ALJ did not explain that he was limiting his considerations of

_____

[2] The record also contains a November 2008 opinion from Dr. Trinidad, another treating physician. The ALJ did not conduct a full treating physician's analysis of this opinion, either. However, Dr. Trinidad concluded that plaintiff could perform light duty at his current job (maintenance worker) with no restrictions on lifting, bending, and twisting. (R. 272-76).

[3] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

these opinions because they pre-dated plaintiff's alleged disability onset date. More importantly, because Dr. Marouk's opinion imposed *permanent* restrictions, "the fact that the report precedes the designated disability period is of limited practical import." Lackey, 127 F.App'x. at 458. The ALJ did not cite any evidence that these permanent restrictions were no longer applicable and did not conduct a full analysis of the opinion to determine that these restrictions were not entitled to controlling weight. Accordingly, without an explanation that would support excluding the lifting, bending, and twisting restrictions from the residual functional capacity findings, the ALJ should have included those limitations.

The Commissioner's argument that the lifting, bending, and twisting restrictions are consistent with the ALJ's residual functional capacity findings is also not fully supported by the evidence. The Commissioner appears to argue that the failure to include these limitations is harmless error. The Tenth Circuit has upheld the application of the principle of harmless error in Social Security disability cases when "the ALJ's errors do not require reversal because other reasoning already contained explicitly or implicitly in his decision supplied sufficient grounds for affirmance notwithstanding the error." Groberg v. Astrue, 505 F.App'x 763, 766 n. 1 (10th Cir. 2012). However, the court reviewing the ALJ's decision may not "create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself." Haga v. Astrue, 482 F.3d 1205, 1207-08 (10th Cir. 2007).

In this case, although the ALJ did not adopt Dr. Marouk's restrictions on lifting, bending, and twisting, his step five findings with respect to lifting and bending are consistent with Dr. Marouk's restrictions.

The twenty-five pound lifting restriction exceeds the lifting requirements for light work, so with respect to the lifting restrictions, the undersigned is satisfied that Dr. Marouk's opinion is

consistent with the ALJ's residual functional capacity findings. See 20 C.F.R. §§ 404.1567, 416.967 (defining light work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.").

The undersigned also can resolve any concerns about the bending restrictions under a harmless error analysis. SSR 83-10 provides that bending encompasses both stooping and crouching but "[t]he lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent stooping." SSR 83-10. The ALJ found that plaintiff could perform other work, such as a bakery racker (DOT 524.687-018), bottling line attendant (DOT 920.687-042), or silver wrapper (DOT 318.687-018). (R. 36). These jobs require no stooping or crouching. See U.S. Dep't of Labor, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, Part A (1993) ("SCO"). Therefore, the plaintiff's ability to perform these jobs is not impacted by Dr. Marouk's restrictions on bending.

With respect to twisting, however, the undersigned finds that the ALJ's residual functional capacity findings are not consistent with Dr. Marouk's restrictions; therefore, the failure to properly weigh Dr. Marouk's opinion is not harmless error. The SCO does not address the physical demand of twisting, so the ALJ would have to rely on the testimony of a vocational expert to determine whether plaintiff could perform other work with a limitation on twisting. See Segovia v. Astrue, 226 F.App'x 801, 804 (10th Cir. 2007) (unpublished) (holding that the ALJ may rely on a vocational expert to resolve implied conflicts in the Dictionary of Occupational Titles and SCO or to "clarif[y] how their broad categorizations apply to [a] specific case"). Without including a restriction on twisting in the hypothetical to the vocational expert, the ALJ could not determine whether the other jobs he relied on at step five were consistent with Dr.

Marouk's restrictions. Therefore, the Commissioner's argument that the ALJ's residual functional capacity findings are consistent with Dr. Marouk's restrictions must fail.

For these reasons, the undersigned recommends that the District Court reverse and remand to permit the ALJ to conduct a treating physician's analysis of Dr. Marouk's opinion.

**Function Reports**

Plaintiff argues that the ALJ misinterpreted two function reports in the record. (Dkt. 14). Plaintiff argues that he authored both reports but that the ALJ attributed one report to plaintiff and one report to plaintiff's friend. Id. Plaintiff contends, without explanation, that the ALJ's confusion prejudiced him.

The undersigned disagrees with plaintiff on both points. The first function report in the record, dated October 14, 2011, is signed "Kevin/Betty Hairl." (R. 201-10). The second function report, dated October 17, 2011, is signed "Betty Hairl." (R. 219-26). The ALJ attributed the first report to plaintiff and the second to Ms. Hairl. (R. 35). Although Ms. Hairl should have completed a third-party function report form, the undersigned finds that the ALJ properly interpreted the evidence.

SSR 06-03p states that the ALJ must consider evidence from "'non-medical sources' who have not seen the individual in a professional capacity in connection with their impairments, such as spouses, parents, friends, and neighbors." For these sources, "it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." Id. That Ruling also acknowledges, however, that there is a distinction between what an ALJ must consider and what an ALJ must explain. See SSR 06-03p. Specifically, the Ruling states that for those "other source" opinions that do not require discussion, the ALJ "generally should

18

explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." Id.

In this case, the ALJ considered plaintiff's function report as part of his review of the evidence. (R. 31). The ALJ also discussed Ms. Hairl's opinions from her function report, in which she stated that plaintiff "could lift twenty-five pounds and walk three blocks" but had difficulty "lifting, squatting, bending, standing, reaching, walking, sitting, and kneeling." Id. The ALJ gave little weight to Ms. Hairl's opinion because "she is not a physician or health field professional." Id. In light of the specific functional limitations that Ms. Hairl included in her function report, the undersigned finds that the ALJ's reason for giving little weight to Ms. Hairl's opinion meets the criteria for SSR 06-03p for "any other factors that tend to support or refute the evidence."

### Credibility

Plaintiff argues that the ALJ did not discuss all of the credibility factors and failed to identify which of plaintiff's statements he found credible. (Dkt. 14). Plaintiff also argues that the ALJ did not credit plaintiff for seeking treatment and failed to properly consider plaintiff's pain. Id. Plaintiff contends that the ALJ resorted to relying on boilerplate language rather than linking his findings to specific evidence in the record. Id.

This Court is not to disturb an ALJ's credibility findings if they are supported by substantial evidence because "[c]redibility determinations are peculiarly the province of the finder of fact." Cowan v. Astrue, 552 F.3d 1182, 1190 (10th Cir. 2008) (citing Diaz v. Secretary of Health & Human Svcs., 898 F.2d 774, 777 (10th Cir. 1990)). Credibility findings "should be

closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Id. (citing Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted)). The ALJ may consider a number of factors in assessing a claimant's credibility, including "the levels of medication and their effectiveness, the extensiveness of the attempts . . . to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, . . . and the consistency or compatibility of nonmedical testimony with objective medical evidence." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).

The ALJ found that plaintiff was not entirely credible because his subjective complaints were not consistent with the medical evidence and because his activities of daily living were not consistent with the medical evidence. (R. 34-35). The ALJ noted that plaintiff did not seek treatment for back pain between late 2008 and September 2011. (R. 34). Plaintiff also received routine, conservative treatment and reported that his medication was effective. Id. Similarly, with respect to plaintiff's mental impairments, the ALJ noted that plaintiff's depression was not severe enough to warrant more than routine medication management and that plaintiff stated his medication helped. Id. With respect to plaintiff's activities of daily living, the ALJ cited plaintiff's testimony regarding his daily routine, which was inconsistent and considerably more limited than the activities reported in plaintiff's function report and the third-party function report from Ms. Hairl. (R. 35). The ALJ also stated that plaintiff's report of limited activities of daily living was inconsistent with "the relatively weak medical evidence." Id. Although the ALJ did not conduct an in-depth credibility analysis, the undersigned finds that the ALJ satisfied his duty to weigh plaintiff's credibility and link his findings to substantial evidence in the record.

## RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that the Commissioner's decision at step five in this case be **REVERSED AND REMANDED IN PART and AFFIRMED IN PART**. On remand, the ALJ should

(1) properly assess plaintiff's literacy. The ALJ is free to order additional testing, if needed; and

(2) properly weigh Dr. Marouk's opinion, addressing the permanent restrictions imposed in that opinion. The ALJ is free to take additional testimony from the vocational expert, if needed.

The undersigned finds that plaintiff's remaining allegations of error related to the function reports and the credibility findings are without merit and should be affirmed.

## OBJECTION

In accordance with 28 U.S.C. §636(b) and Fed. R. Civ. P. 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by June 18, 2015.

If specific written objections are timely filed, Fed. R. Civ. P. 72(b)(3) directs the district judge to determine *de novo* any part of the magistrate judge's disposition to which a party has properly objected. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions. See also 28 U.S.C. § 636(b)(1). The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of factual and legal questions." United States v. One Parcel of Real Property, 73

F.3d 1057, 1059 (10th Cir. 1996) (quoting <u>Moore v. United States</u>, 950 F.2d 656, 659 (10th Cir. 1991)). Only a timely specific objection will preserve an issue for *de novo* review by the district court or for appellate review.

SUBMITTED this 4th day of June, 2015.

_____
T. Lane Wilson
United States Magistrate Judge